**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

BUDDY WEBSTER p/k/a BUDDY
BLAZE,

        Plaintiff,

v.

DEAN GUITARS; ARMADILLO
ENTERPRISES, INC.; ARMADILLO
DISTRIBUTION ENTERPRISES, INC.;
ESTATE OF DIMEBAG DARRELL
ABBOTT, an unknown entity; GUITAR
CENTER, INC., a Delaware corporation;
RITA HANEY an individual; EMOJI
FAME, a New York business entity of
unknown form; and DOES 1-10 inclusive,

        Defendants.

_____/

CASE NO. 8:17-cv-1795-WFJ-CPT

JURY TRIAL DEMANDED

## <u>PLAINTIFF BUDDY WEBSTER'S MOTION FOR SUMMARY JUDGMENT</u>

        Buddy Webster p/k/a Buddy Blaze ("Webster") submits this partial motion for

summary judgment against Armadillo Enterprises, Inc dba Dean Gutars that Webster

should prevail on the issues of: (i) invasion of right of privacy; (ii) Florida unfair

competition; (iii) violation of the Lanham Act by false advertising; and (iv) copyright

infringement.

## I.     INTRODUCTION

"Dimebag" Darrell Abbott's as a famous guitarist, and his most famous guitar was the "Dean From Hell," which was created by Plaintiff Buddy Webster, one of Abbott's best friends.  Defendant Armadillo Enterprises, Inc. owns Dean Guitars ("Armadillo" or "Dean"), which made the original guitar that Webster turned in to the Dean From Hell ("DFH").  The DFH features a distinctive graphic (the so-called "Lightning Storm Graphic") that was conceived and created by Webster as part of his overall design for the DFH.

Abbott was tragically murdered, and since then, Armadillo has made millions of dollars on this design, but has never paid Webster a nickel. Worse, Dean has used Webster in its marketing because it knows Webster is a world famous luthier who lends credibility to its consumer line. Now that discovery has closed, it is apparent that Webster has been used and abused by Armdaillo. Summary judgment on several claims is appropriate.

## II.     MOVANTS' STATEMENT OF MATERIAL FACTS AS TO WHICH THERE ARE NO GENUINE ISSUES FOR TRIAL

1.      Webster is a famous luthier and guitar technician. He uses the name "Buddy Blaze."  He has made guitars for artists such as Slash, Joe Perry from Aerosmith and Kirk Hammett from Metallica.  (Declaration of Eric Bjorgum ("Bjorgum Decl."), Exh. A.; Declaration of Brad Tolinski ("Tolinski Decl."), ¶ 12; Declaration of Scott Patton ("Patton Decl."), ¶¶ 3 -5; Expert Report of Alan Niven, Bjorgum Decl., Exh. N.)

2.      In 1985, Webster took a stock maroon Dean ML guitar and repainted it blue.  Eventually, he made additional changes, including physically hollowing out the guitar to accommodate a Floyd Rose tremolo bar and locking system, grinding down the metal guitar string "saddles" to accommodate the Floyd Rose system, installing the Floyd Rose tremolo bar in the untraditional "top mount" position, changing the electromagnetic pickups under the guitar strings, sanding the neck of the guitar to a different shape, changing the color of the jack plate and knobs to black, using only black and chrome hardware, and repainting the guitar another shade of blue with a burst of lightning coming down out of a background of dark clouds (the so-called "Lightning Storm Graphic").  (Declaration of Buddy Webster ("Webster Decl."), ¶ ¶ 8 – 32.)

3.      Webster gave the guitar to younger friend, Darrell Abbott (pka "Diamond Darrell" or "Dimebag Darrell"), whom Webster recognized as an enormous talent and who went on to become one of the most important guitarists of his generation as part of the band Pantera.  Abbott christened the guitar the "Dean From Hell."  (Webster Decl., ¶¶ 44, 45, 48.)

4.      Abbott was tragically murdered in December, 2004, less than two months after signing a deal to return to Dean Guitars.  (Declaration of Steve Parnell ("Parnell Decl."), ¶ 5.)

5.      Within months after Abbott's death, Dean Guitars reissued a commemorative edition of the "Dean From Hell."  (Parnell Decl., ¶ 4.)  This edition sold for approximately $5,000.

3

6.      In 2006, Dean Guitars issued an import version of the Dean From Hell,
alternatively known as the "CFH" (after the Pantera album "Cowboys from Hell") or
"DFH/CFH."  The CFH was an import guitar with a store price of approximately $800.
(Parnell Decl., ❡ 5; Bjorgum Decl., Exh. B.)

7.      At the Winter 2009 NAMM ("National Association of Music Merchants")
trade show, Elliott Rubinson, the CEO of Dean Guitars, participated in a taped interview
with Buddy Webster in which they were promoting a limited edition "Buddy Blaze ML"
Dean Guitar.  Sitting under the original Dean From Hell, Mr. Rubinson said that Webster
"probably built the most famous metal guitar of all time.  I cannot think of a guitar that is
more recognized, more loved, more photographed than this guitar." That video was
available via link from Dean Guitars's web site. (See Video of Buddy Blaze and Dean
Guitars CEO Elliott Rubinson at 5:55, previously filed at Dkt.No. 129-11, Exh. 10 to
Naydonov Decl.)[1]

8.      Buddy Webster pka Buddy Blaze has been recognized in print and in the
guitar industry as the creator of the Dean from Hell.  (Webster Decl., Exh. K; Declaration
of Brad Tolinsky.)

9.      In her responses to Webster's Interrogatories, Defendant Rita Haney states
that Subject to the above general and specific objections, Haney responds that, in around
January 2005, Haney was approached by Dean Zelinksy at the NAMM trade show party.
Zelinsky told Haney that Webster, who was also present at the event, reached out to

---

[1] Copies of the videos have previously been lodged as Exhibits to Defendants' Joint Motion for Summary
Judgment (Dkt. No. 129).  To lessen the burden on the Court and the parties, Plaintiff will cite to those
lodged copies of the videos for this motion.

Elliott Rubinson (Armadillo's late CEO) claiming he owned the "Dean from Hell" and was owed compensation. Haney claims immediately confronted Webster and told him he had no rights, and that the "Dean from Hell" had always belonged to Darrell Abbott. Confronted by Haney, Webster quickly recanted and said: "I have no claim to it." Haney then allowed Webster to stay at her NAMM party. Dean Zelinsky and Webster's son (who has since passed away) were also present during that conversation. In around 2007, Haney was contacted by Elliott Rubinson, who stated that Webster was back and was again making claims that he owned the "Dean from Hell" lightning bolt design. Haney told Elliott Rubinson that, just as she had told Webster in 2005, Darrell Abbott (and now his Estate) was the owner of the design and Webster did not have any rights in the design. (Bjorgum Decl. Exh. P (under seal).)

10.    In April, 2007, Webster contacted Rubinson to ask about the continued reproduction of his guitar, and he was sent an email on April 30, 2007 stating that the guitar design and copyright in its graphic were owned by the Estate of Darrell Abbott.  In the same email Rubinson mentioned the desire to make "relic" of the Dean From Hell and pay Webster a royalty.  (Bjorgum Decl, Exh. D.)

11.    In or around 2009, another version of the guitar was released, called the "Rust from Hell" that featured a "painted-on relic" graphic design that retailed for MSRP $4,999.

12.    In 2015, another high-end version of the Dean From Hell, the "Limited USA Dean From Hell" was created by Dean Guitars and marketed as a near-perfect replica of the original Dean From Hell. It is described as "the one that "Buddy Blaze

painted."  "As close to the Dean From Hell" as Dean possibly could. It mentions the

"famous, iconic, Dean From Hell blue lightning bolt paint job."  (See "NAMM 2015"

Video, Dkt.No. 129-11, Exh. 12 to Naydonov Decl.)  It had an MSRP of $5,443.90 and

retailed for $3,699.  (Bjorgum Decl, Exh. E.)

13.      Promotion of the 2015 American Dean From Hell mentioned that the

guitar had "the Buddy Blaze paint job," but, even though it parroted the language of the

Rubinson interview by claiming the guitar was one of the most "iconic metal guitars of

all time," Buddy Blaze's name was dropped in connection with the design of the guitar.

(See "NAMM 2015" Video, Dkt.No. 129-11, Exh. 12 to Naydonov Decl.)

14.      Dean Guitars also eventually used the Lightning Storm Graphic on a black

guitar, which it dubbed the "Black Bolt."  (Bjorgum Decl., Exh. F.)

15.      In addition to the 2009 interview with Rubinson and the 2015 marketing

statement by Josh Maloney, Dean has made available on its website videos of Webster at

NAMM discussing his creation of the Dean From Hell, as part of its "Dean On Demand"

Youtube channel.  (Bjorgum Decl., Exh. G.)

16.      Webster conceived of and created the Lightning Storm Graphic.  He is the

author of the Lightning Storm Graphic. (Declaration of Buddy Webster ("Webster

Decl."), ₱ ₱ 8 – 32.)

17.      Webster owns a copyright registration on the Lightning Storm Graphic,

which he had never authorized for general publication until entering into a license

agreement in 2018 with a former Defendant in this case.  (Bjorgum Decl., Exh. H.)

6

18.     Webster has never been paid anything by Dean Guitars for either the copyright on the Lightning Storm Graphic or the use of Webster's name or image in connection with any guitar associated with the Dean From Hell.

19.     Fans and individuals who follow the career of Abbott and the Dean From Hell assume that the copies of the Dean From Hell are approved or sponsored by Webster, and that he make money from them. A recent post online stated that "buddy was the only reason we guys got the blue lightning bolt guitar."  (Bjorgum Decl., Exh. I.)

20.     Webster paid Craig Patchin, an independent contractor at Speir Music, to paint the actual lightning bolts on the guitar.  Webster disclosed Patchin's work to Rubinson and Zelinsky in 2005, we well as in a Guitar World article in 2012.  (Webster Decl., ¶ 23.)

21.     Two former employees of Speir Music who worked with Craig Patchin have declared that Webster closely directed Craig Patchin in how to paint the Dean From Hell.  Steven Locke declares that Webster literally stood over Patchin telling him where to paint the lightning bolts. Paul Harris declares that "Buddy was directing Patchin how to paint the guitar."  (See Declaration of Paul Harris; Declaration of Steven Locke.)

22.     Webster also designed a guitar called the "Kramer NightSwan" which is no longer available and used versions have gone up substantially in price.  (Bjorgum Decl., Exh. H.)

23.     Dean has sold 100's of "Dean From Hell" copy models in the last three years.  They are consistently one of the biggest sellers at Dean.

### III.    Background Facts

Plaintiff Buddy Webster is a well known guitar maker and technician.  He lived his early adult life in the Dallas, Texas area where he played guitar in bands under the name Buddy Blaze.  By day, he was a machinist.  He combined his love of guitars with his mechanical abilities and began experimenting with fixing and modifying guitars.  One of his favorite guitar brands was Dean Guitars, a company that created a guitar design known as the "ML."  The Dean ML featured a body that was jagged on each side. (Declaration of Buddy Webster ("Webster Decl."), ℗ 2.)

Dean Guitars were not particularly popular at the time, so Webster was able to find them used and at pawn shops near his work.  Webster's wife Joyce worked with a woman named Carolyn Abbott, and Ms. Abbott told Ms. Webster that her son Darrell had won a local guitar contest as a young teenager.  Webster was quite surprised by that, so he wanted to meet Darrell Abbott.  Darrell Abbott and his brother Vinnie (who played drums) had a band named "Pantera," and by the mid-1990's Darrell would be known as one of the top guitarists in the world, and Pantera would be a multi-platinum band. (Webster Decl., ℗ 3.)

Webster took Darrell Abbott under his wing, taking him to local clubs and explaining the rock and roll business to him.  Prior to meeting Webster, Darrell had won a maroon color Dean guitar in a contest.  He already had one Dean guitar, so he offered to sell this second one to Mr. Webster.  Mr. Webster declined and admonished Darrell that he should not sell his trophies.  Mr. Abbott eventually sold the guitar to the singer in Mr. Webster's band.  Mr. Webster then secretly traded his favorite guitar for that Dean guitar.

(Webster Decl., ⁋ 4.; Bjorgum Decl., Exh. J (selections from "Black Tooth Grin" by Zac Crain)**.**

Mr. Webster then began to refurbish the maroon Dean guitar.  First, he painted it blue because his stage persona always involved blue.  He then added a so-called "Floyd Rose" tremolo system.  A Floyd Rose is a lever that allows the guitarist to bend strings so that the intonation of a note changes.  The Floyd Rose system is very robust and keeps the guitar in tune, despite the bending of the strings.  However, the maroon Dean guitar was not set up for the Floyd Rose, so Mr. Webster hollowed out the body of the guitar and ground down the "saddles" that guide the strings by hand (employing his skills as a machinist).  The Floyd Rose bar was also mounted in the "top" position, which is unusual.  (See Webster Decl., ⁋⁋ 8 – 32 and Exhibits thereto.)

Webster then reshaped the neck of the guitar. He also changed the color of all the hardware so that it was black and chrome rather than brass.  He also changed the electromagnetic pickups on the guitar so that it would output a higher volume.  (See Webster Decl., ⁋⁋ 8 – 32 and Exhibits thereto.)

Finally, Webster changed the paint job on the guitar.  He decided that he wanted a natural theme, either a lightning bolt or a tiger stripe pattern.  He eventually settled on the lightning bolts, and he wanted the lightning bolts to look realistic – not like cartoon lightning. (Webster Decl., ⁋⁋ 15 - 29.)

To achieve the desired effect, Webster looked in magazines and encyclopedias. He noticed that lightning has a "flash" around it that emanates light in a hazy pattern.  He also wanted the lightning to come from dark clouds.  He wanted the bottom of the guitar

to be lighter than the top of the guitar, so that the guitar would appear luminescent on stage when it was lit from above.   (Webster Decl., ⁋ ⁋ 15 - 29.)

Webster had spent time at a local guitar store called Speir Music, which was a large Dean Guitar dealer.  (Declaration of Locke, Harris and Webster.)  The Abbott brothers were fixtures in the store as well.  Webster eventually began fixing guitars at Speir Music, as a contractor.  Before him, however, guitars were being fixed by Craig Patchin.  Speir had a paint booth, so, even though Webster could paint his own guitars, he paid Patchin to follow his instructions and paint the guitar that became the Dean From Hell (hereafter "DFH").  Patchin had painted an initial "strat" body sample with lightning bolts, but the bolts were too yellow, and Webster directed him to make the bolts more white.  (Webster Decl., ⁋ ⁋ 15 - 29.)

Specifically, Webster chose the new blue color and mixed the paints with Patchin. He then oversaw Patchin as Patchin painted the blue background on the guitar.  He then instructed Patchin to paint realistic lightning bolts emanating from a dark cloud.  He put his hands on the guitar and explained where the lightning bolts would go.  Webster was not happy with the absence of clouds at first and asked Patchin to add them.  Patchin then painted the bolts on the guitar, and Webster retrieved the finished guitar a week or two later.  (Webster Decl., ⁋ ⁋ 15 - 29.)  Steve Locke and Paul Harris, both of whom worked at Speir Music, have testified that Webster oversaw Patchin.  The DFH became Webster's favorite guitar.

In  1987, Abbott got to see and play the DFH.  Abbott fell in love with the guitar and begged Webster to make him a copy.  At about the same time, Webster made a guitar

for Vivian Campbell, a very well known guitarist for the band Dio who had recently joined Whitesnake. Campbell currently plays for multi-platinum act Def Leppard, making him one of the most versatile and famous guitarists in the hard rock genre. (Webster Decl., ., ¶ ¶ 40 - 44.)

In March, 1987, Campbell traveled to the Dallas Guitar Show, where he met Abbott and Webster. Abbott was thrilled to meet Campbell. The guitar that Webster subsequently made for Campbell became known as the Blaze Shredder. Webster suddenly became one of the hottest new guitar makers in the world. He was offered a job as an artist representative at Kramer Guitars in New Jersey. Famous guitarists like Eddie Van Halen played Kramer Guitars. Webster and Ms. Webster moved to New Jersey. (Webster Decl., ., ¶ ¶ 40 - 44.)

Webster left Dallas, and after he did, he eventually told Abbott that he could keep the DFH. He explained to Abbott that it was the same guitar that Abbott had previously won and sold to Webster's singer. Abbott was overcome with gratitude. At the time he left Dallas, Webster was far more well-known than Abbott. While at Kramer, he designed the Nightswan, a guitar played by Vivian Campbell, which became Webster's most famous guitar. (Webster Decl., Exh. H.)

Meanwhile, Pantera's reputation kept growing, and it got a new singer (Phil Anselmo). The musical direction of the band changed from a pop/metal sound to a heavy, more rhythmic "groove metal" sound that became hugely popular. Webster continued to follow Abbott and even got him his first major coverage by a national guitar magazine when Abbott played in New York.

Abbott took the guitar that Webster gave him as a gift and on the headstock wrote "The" before "Dean" and "From Hell" after "Dean," so that it read "The Dean From Hell." Abbott played the DFH in countless videos and live performances. Dean Guitars was in financial turmoil and was eventually bought by Elliott Rubinson, who had owned a string of music stores in the Southeastern U.S.

Pantera eventually broke up, and the Abbott brothers started a new band, Damage Plan. Tragically, Darrell Abbott was shot onstage by a deranged fan in December, 2004, just weeks after signing a new deal with Dean Guitars. The music world was stunned. Shortly before Abbott's death, he recorded an interview with Dean Zelinsky's son Tyler, stating that Webster created the DFH. (See "Dimebag Darrell Interview Dean Guitars," at 3:40, Dkt. No. 129-7, Exh. 5 to Naydonov Decl.) Oddly, that part of the video has been edited out of another version of the video filed by Defendant Dean Guitars. (See "Dimebag Talks About His Lifelong Love Affair with Dean Guitars, Dkt. No. 129-8, Exh. 7 to Naydonov Decl.)

While at Abbott's funeral, Webster was approached by Rubinson and Dean Zelinsky (the previous owner of Dean Guitars). Zelinsky introduced Webster to Rubinson. He stated that they had been looking for Webster. Webster explained that he was in Abbott's cell phone and would be easy to find.

Just after Abbott's funeral, Webster was called by Zelinsky, who asked him to paint a copy of the DFH. Webster explained that he did not have a paint booth set up. He also told Zelinsky that an individual name Craig Patchin had done the painting at his direction. In November or December, 2004, Dean announced a limited edition run of

12

DFH copies of just 150 units for $5000.  Webster was not aware of this until the day of

Darrell's murder and did not approve of these copies, but he felt that the family now

needed the money, so he did not stop them. (Webster Decl., ¶¶ 52 – 53.)

In 2006, Dean introduced a cheap copy of the DFH, called the Cowboy from

Hell, or "DFH / CFH."  Webster was not happy that his gift to his friend was being

exploited.  Moreover, following Abbott's death, many people associated with Pantera

received odd, disturbing and sometimes threatening emails, including Stephen Jensen, a

graphic artist who worked with Dean Guitars occasionally.  (Webster Decl., ¶ 54.)

Webster and his wife relocated to Hawaii and eventually moved their son to

Hawaii in part to isolate their son from illegal drugs that plagued the Los Angeles area

where the family lived.  Webster and Ms. Webster spent much of their savings putting

their son through various rehabilitation centers, but in  2009, he succumbed to an

overdose of morphine.  The Websters spent the next year working with police to track

down the drug dealer who sold the morphine to their son.  That dealer is now in prison.

(Webster Decl., ¶ 55.)

However, Webster never stopped asserting his rights in the DFH. Rita Haney's

Interrogatory responses admit that she knew in 2005 that Webster was asserting rights in

the DFH.  In 2007, Webster contacted Rubinson to object to the continuing release of the

DFH.  Rubinson responded that "people in the know" maintained that the Estate owned

the image.  He also stated that Rita Haney and he were considering a "relic" of the DFH.

Webster believed this was a tactic to avoid litigation because Rubinson believed Webster

would not sue the estate of his friend.  Typically, a relic is a guitar that has been created

and physically worn down so that it resembles an old player-worn guitar.  Abbott's guitar was famously beat up because he played so physically.  In or around 2009, Dean released the so-called "Rust From Hell" which featured a "paint-on relic" graphic that was nearly identical in appearance to Abbott's guitar when he died.  That guitar was limited to 100 pieces and carried an MSRP of $4,999. (See Webster Decl, ¶ 59, Exh. I.)

However, over the years, Webster periodically spoke with Rubinson about the DFH and asked to either be involved with the guitar and receive a royalty, or that the guitar stop being made. (Bjorgum Decl., Exh. D.) In 2008, Webster approached Dean Zelinsky and Elliott Rubinson at NAMM and told them that he did not want them to continue to exploit Abbott's legacy and the DFH.  Ms. Webster was also present during this conversation.   Fans of Abbott had become tired of the continued exploitation of Abbott's death.  Some of them equated Webster with the exploitation and accused him of profiteering.  (Webster Decl., ¶ 56.)

Indeed, in 2009, Webster did a "Buddy Blaze ML" model guitar with Dean.  It has been suggested in this litigation that Dean created that guitar as a "settlement" of Webster's claims in this action.  That is ridiculous.  Elliott Rubinson was suspicious of attorneys and did not even have a written agreement – much less a settlement agreement – regarding the Buddy Blaze ML. (Webster Decl., ¶ 58.)

In 2015, Dean issued the DFH one more time as the "American Limited Dean From Hell" which was supposed to be an authentic copy of the original DFH.  Webster had finally had enough. In point of fact, just looking at a picture of the latest Limited Edition of the DFH, Webster Webster could find several differences between it and the original

DFH.  The publicity for the Limited Edition omitted Webster from the creation of the

DFH, but it conceded that the DFH had a "Buddy Blaze Paint Job."  (Webster Decl., ¶¶

60 – 61.)

In 2016,  Webster retained counsel and wrote to Rubinson, asking him to stop

reproducing the Dean From Hell.  Rubinson did not respond, but instead forwarded the

letter to counsel.  (Bjorgum Decl., Exh. I, J.)

In late 2016, Webster learned the Rubinson had brain cancer. Webster had

contemplated filing suit against Dean Guitars, but he did not wish to antagonize Rubinson

as he struggled with cancer.  In early 2017, Rubinson passed away.  A few months later,

Webster filed this case.


## IV.    ARGUMENT

### A.  The Standard for Summary Judgment

Summary judgment is proper if "there is no genuine dispute as to any material

fact and … the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

The movant bears the initial burden of informing the court of the basis for its motion and

identifying those materials that show the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the non-

movant to "come forward with specific facts showing that there is a genuine issue for

trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). To

meet this burden, the non-movant "may not rest upon the mere allegations or denials of

the adverse party's pleadings." *Lane v. MRA Holdings, LLC*, 242 F. Supp. 2d 1205, 1211-

1212 (M.D. Fla. 2002). Nor may the non-movant rely on a mere scintilla of evidence

supporting its position. *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990). Rather,

the non-moving party must establish, through the record presented to the Court, that it is

capable of providing evidence sufficient for a reasonable jury rule in its favor. *Cohen v.

United Am. Bank*, 83 F.3d 1347, 1349 (11th Cir. 1996).

**B.  There Is No Issue of Fact Regarding Webster's Claim for Invasion of
Privacy By Misappropriation**

There is no issue of fact regarding the invasion of privacy claim. The three

elements of invasion of privacy by misappropriation are: (1) the defendant appropriated

the plaintiff's name or likeness for the value associated with it; (2) the plaintiff can be

identified from the publication; and (3) there was some advantage or benefit to the

defendant.  *Express One Int'l v. Steinbeck,* 53 S.W.3d 895, 900 (Tex. App. 2001).  Texas

law does not protect a name *per se,* but the value associated with it. *Matthews v.

Wozencraft,* 15 F.3d 432, 437 (5th Cir.1994) (one who appropriates to his own use or

benefit the name or likeness of another is subject to liability for invasion of privacy)

Liability for invasion of privacy arises when the defendant appropriates for his own

benefit the commercial standing, reputation, or other values associated with the plaintiff's

name. *See id.* Generally, an appropriation becomes actionable when the name is used "to

advertise the defendant's business or product, or for some similar commercial purpose."

Here, Webster meets these elements.  Dean Guitars used his image and name for

the value associated with it.  Webster is known as "Buddy Blaze" as a guitar maker.

(Webster Decl., ⁋ 2.)   He is also known as the originator of the Dean From Hell.

(Webster Decl., Guitars that Shook the Earth; Bjorgum Decl., Articles).

Dean Guitars misappropriated Webster's name.  Per the declaration of Steve

Parnell, Webster's name was used by sellers of Dean Guitars at NAMM shows to sell

copies of the Dean From Hell.  (Parnell, ⁋ 9.)  They used his name and likeness in the

videos, ostensibly with his permission at first to discuss the history of the Dean From

Hell, but never to sell reissues of the Dean From Hell.  (Dkt. No. 129-11, Video of Buddy

Blaze and Dean Guitars CEO Elliott Rubinson at 5:55 on video.; "Dean on Demand" web

portal, Bjorgum Decl., Exh. G, liking to videos at

https://www.youtube.com/watch?v=pa_zNJR2NAA&t=268s;

https://www.youtube.com/watch?v=7QYkjWqPltw  ). The Declaration of Brad Tolinski

definitively establishes the value of Webster's name in the guitar world.  (Tolinski Decl.

⁋⁋ 9 – 12.)

Regarding the second factor, Webster can also be identified in the publication.

They use his name, and obviously, he is the person who is Buddy Blaze.  Finally, there is

advantage to the benefit, as established both by the Declaration of Steve Parnell and the

expert report of Alan Niven.

Further, Webster gave no permission for the use of his name.  He grew tired of

being associated with a very bad replica of his guitar. He may have shown up for some

interviews, but he did not give endless permission to have his image used. *Zim v. Western*

*Pub. Co.,* 573 F.2d 1318, 1327*,* 4 Media L. Rep. (BNA) 1467 (5th Cir. 1978) (Use of

author's name outside of use permitted in publishing contract is "tortious."); *John Daly*

*Enterprises, LLC v. Hippo Golf Co., Inc.*, 646 F. Supp. 2d 1347, 1351 (S.D. Fla. 2009) (Use of professional golfer's name and picture on webpage after his endorsement agreement ended is infringement of his right of publicity. Summary judgment for plaintiff.). McCarthy agrees this is the law across the country. McCarthy, 2 Rights of Publicity and Privacy § 10:36 (2d ed). ("It is clear that use by a licensee which is outside the defined scope of the license not only constitutes breach of the license contract, it also gives rise to an action by the licensor for invasion of privacy or infringement of the right of publicity.")

As late as when this case was filed, Dean Guitars was still running videos of Webster on its "Dean On Demand" YouTube Channel.  (Bjorgum Decl., Exh. G.)

**C.  There Is No Issue Of That Florida Law of Unfair Competition Has Been Violated**

To a state a claim for unfair competition under Florida common law a party must plead (1) deceptive or fraudulent conduct of a competitor and (2) likelihood of consumer confusion. *M.G.B. Homes, Inc. v. Ameron Homes, Inc.,* 903 F.2d 1486, 1494 (11th Cir.1990); *Home Design Services, Inc. v. Park Square Enterprises, Inc.,* 2005 WL 1027370, *13–14 (M.D.Fla.2005); *Whitney Information *1325 Network, Inc. v. Gagnon,* 353 F.Supp.2d 1208, 1212–13 (M.D.Fla.2005).

The Florida common law of unfair competition is an "umbrella for all statutory and nonstatutory causes of action arising out of business conduct which is contrary to honest practice in industrial or commercial matters." *American Heritage Life Insurance Company v. Heritage Life Insurance Company,* 494 F.2d 3, 14 (5th Cir.1974); *Chassis*

*Master Corp. v. Borrego,* 610 F.Supp. 473, 479 (S.D.Fla.1985).

This type of situation is exactly what the Florida unfair competition statute is meant to address. Webster's image was used for years in connection with the historical fact of his creation of the Dean From Hell. However, **there is only one Dean From Hell.** Repeatedly, Dean Guitars would trot out Webster at NAMM to talk about the Dean From Hell while it was showing guitars. Over the years, people came to think that Webster was wealthy or had authorized these uses of his name and likeness.

The Court need only consider the videos submitted with this case. For instance, the in the video from NAMM where Ms. Haney is singing. " At Exhibit 6 to the Naydonov Declaration (D.N. 129), the Dean Guitar interviewer asks Webster to "tell us about the guitar.. this "beautiful masterpiece. . . this beautiful piece of artwork." However the guitar is the import copy that sells for $800; it is not the real DFH.

It appears as though he endorses Dean Guitars. This has severe consequences for him, as laid out in the expert report of Alan Niven. (Dean's actions are "indicative of a conscious choice to water down the Abbott name and legacy. That is a decision made by Abbott's Estate. However, to drag Webster into that scenario, which is simply a "race to the bottom," is damaging to his reputation.) See *Chen v. Cayman Arts, Inc.,* 757 F.Supp.2d 1294, 1299 (S.D. Fl. 2010) ("However, Mr. Chen has alleged additional facts in this cause of action. His common law unfair competition claim pleads that Cayman's use of Chen's name and likeness is "likely to cause customer confusion.") )

### D. Defendants Violate Section 43(a) of the Lanham Act

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides that

(1) Any person who, on or in connection with any goods or services, or

any container for goods, uses in commerce any word, term, name, symbol,

or device, or any combination thereof, or any false designation of origin,

false or misleading description of fact, or false or misleading

representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the

affiliation, connection, or association of such person with another person,

or as to the origin, sponsorship, or approval of his or her goods, services,

or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature,

characteristics, qualities, or geographic origin of his or her or another

person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is

or is likely to be damaged by such act.

 "Section 1125(a) thus creates two distinct bases of liability: false association, §

1125(a)(1)(A), and false advertising, § 1125(a)(1)(B)." *Lexmark Int'l, Inc. v. Static

Control Components, Inc., 134 S. Ct. 1377, 1384 (2014); Krupa v. Platinum Plus, LLC*,

2017 WL 1050222, at *3 (M.D. Fla. Mar. 20, 2017)

This Court has recently recognized that use of likeness or persona can be the basis

for a claim of false advertising under the Lanham Act. *Burciaga v. Gold Club Tampa,

Inc.*, 2016 WL 9526567, at *2 (M.D. Fla. Dec. 28, 2016).  The *Burciaga* court stated:

To invoke the Lanham Act's cause of action for false advertising, a plaintiff must plead (and ultimately prove) an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1395, 188 L.Ed. 2d 392 (2014). This zone of interests test and proximate cause requirement provides limits on who may sue for false advertising under the Lanham Act. *Id.* at 1391. To show that a defendant's statements caused the injury, a plaintiff must allege that " '(1) the ... statements were false or misleading; (2) the statements deceived, or had the capacity to deceive, consumers; (3) the deception had a material effect on the consumers' purchasing decision; (4) the misrepresented service affects interstate commerce; and (5) [the plaintiff] has been, or likely will be, injured as a result of the false or misleading statement.' " *Duty Free Americas, Inc. v. Estee Lauder Companies, Inc.*, 797 F.3d 1248, 1277 (11th Cir. 2015) (alteration in original) (quoting *Sovereign Military Hospitaller Order v. Fla. Priory of Knights Hospitallers*, 702 F.3d 1279, 1294 (11th Cir. 2012)).[2]

Plaintiffs allege that they each have a commercial interest in their respective *personas,* (Dkt. 20 ¶¶ 31-41), and that Defendants' use of their *personas* was false and misleading by suggesting that they were associated with Defendants' strip club. (*Id.* ¶¶ 95-96, 221-222, 347-348). In addition, they allege that Defendants' use of their *personas* on their social media

sites deceived or had the capacity to confuse the club's patrons, (*Id.* ¶¶ 97-98, 223-224, 349-350), that the use had a material effect to entice individuals to go the strip club, (*Id.* ¶¶ 98, 224, 350), that the use was targeted to interstate commerce, (*Id.* ¶¶ 99, 225, 351), and that their reputations and brands have been irreparably harmed by "attributing" them to the "strip club lifestyle." (*Id.* ¶¶ 107, 233, 359).

Here, Dean Guitars has used Webster's image and likeness over the years to create that false impression that he endorses the copies of his creation. (Dkt. No. 129-11, Video of Buddy Blaze and Dean Guitars CEO Elliott Rubinson at 5:55 on video.; "Dean on Demand" web portal, Bjorgum Decl., Exh. G, liking to videos at https://www.youtube.com/watch?v=pa_zNJR2NAA&t=268s; https://www.youtube.com/watch?v=7QYkjWqPltw ). (See also "NAMM 2015" Video, Dkt.No. 129-11, Exh. 12 to Naydonov Decl. promoting "Rust From Hell," using Webster's name and coming with an MSRP of $5,443.90 and retailed for $3,699. Bjorgum Decl, Exh. E.)

Over and over again, these videos create the impression that Webster is endorses Dean's guitars. In Exhibit 12 to the Naydonov Declaration (D.N. 129), at around 20 seconds, the guitar is identified as "the one that Buddy Blaze painted way back in the day." At 2:28 – it is the "famous, iconic blue lightning bolt paint job". At Exhibit 6 to the Naydonov Declaration Point, the Dean Guitar interviewer asks Webster to "tell us about the guitar.. this "beautiful masterpiece. . . this beautiful piece of artwork." However the guitar is the import copy that sells for $800; it is not the real DFH.

These are material misrepresentations.  For instance, in Exhibit 12 to the
Naydonov Declaration (the 2015 reissue), the narrator states the guitar is "as close to the
original as possible." As shown by the exchange with a fan online just this year, people
have bought lightning bolt guitars thinking they benefit Webster.  (Bjorgum Decl., Exh.
I.)  Other fans have complained that Dean has been watering down the brand.  (Bjorgum
Decl., Exh. S.)  This is indicative of a pattern and practice of misrepresenting limited
edition guitars. These acts are also in interstate commerce.

The Court should enter summary judgment on Webster's behalf for violation of
the Lanham Act.

### E.    **Plaintiff's Copyright Has Been Infringed**

A claim for copyright infringement has two elements: ownership and
infringement.  *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1232-33 (11th Cir. 2010)
(To establish a prima facie case of copyright infringement, two elements must be proven:
(1) ownership of a valid copyright, and (2) copying of constituent elements of
the work that are original.  To satisfy the second prong, a plaintiff must establish, as a
factual matter, that the alleged infringer actually copied plaintiff's copyrighted material.)

### B.  Webster Owns A Copyright in the Lightning Storm Graphic

Webster is clearly the author.  He owns a copyright registration.  The work was
not published until 2016.  (Bjorgum Decl., Exh. K.)

Craig Patchin has no copyright interest in the Lightning Storm Graphic.  Patchin
merely implemented Webster's ideas.  As noted in Fisher v. Klein, 1990 WL 10072477,
at *1796 (S.D. N.Y. 1990) "sculptors nowadays who work in huge materials, I-beams,

storage tanks, things like that, that are welded together where the sculptor's contribution is rendered entirely by the giving of instructions to workmen to put a member in a certain position and bolt it to another member and so forth. I think it is clear without question that such participation is authorship. Such carrying out of ideas of authorship is recognized as authorship under the copyright law even if the author never places his hand on the material." Professor Patry calls this a "sensible position has been followed in subsequent cases. By contrast, those who do not conceive of the work and who contribute merely mechanical, noncreative efforts or ideas to a work's development are not authors. In Judge Leval's example those who merely hoisted the beams into place or welded parts together would not be authors." § 5:3.Generally, 2 Patry on Copyright § 5:3.

Defendant Dean Guitars and Defendant Guitar Center clearly copied Webster's copyright by selling the DFH/CFH and the Rust From Hell. There is really no issue about. This case is simple. If Webster owns the copyright, he wins. And there is no doubt he owns the copyright.

Further, Patchin's Declaration has serious credibility problems. As shown in detail in Webster's Declaration in relation to the Defendant's MSJ, he Patchin is not telling the truth. (See Dkt. No. 143.)

Moreover, Webster has two contemporaneous declarants who can who cast doubt on Patchin. Both Paul Harris and Steven Locke worked at Speir Music. Both of them claim that they witnessed Webtster's direct involvement in all phases of the creation of the Dean From Hell. Indeed, Locke testifies that he remembered Webster directing Pathing to paint the lightning bolts.

Thus, the Court should find the Webster is the sole author of the Lightning Storm

Graphic and it is infringed.

## V.       CONCLUSION

For the foregoing reasons, the Court should grant this motion and limit the issues

for trial.


Dated:   October 1, 2018          KARISH & BJORGUM, PC
                                  */s/ A. Eric Bjorgum/*
                                  A. Eric Bjorgum
                                  Attorneys for Plaintiff
                                  BUDDY Webster